IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HMC INCORPORATED,<br><br>and<br><br>KARA DIPIETRO, individually,<br><br>               Plaintiffs,<br><br>   v.<br><br>COMPLETE BUSINESS SOLUTIONS GROUP, INC.<br>d/b/a PARR FUNDING and FAST ADVANCE<br>FUNDING, INC.,<br><br>          Defendants. | CIVIL ACTION NO.19-cv-3285<br><br><br>JURY TRIAL DEMANDED<br><br>**FIRST AMENDED<br>COMPLAINT** |

Plaintiffs HMC Incorporated and Kara DiPietro ("Plaintiffs") by and through their attorneys, file their Complaint against Defendants Complete Business Solutions Group, Inc. d/b/a Par Funding ("CBSG") and Fast Advance Funding, Inc., and allege as follows upon personal knowledge as to themselves and their own acts and experience, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE ACTION

1.     This is an action to save a business from the fraudulent and extortionate collection practices of Defendants who freely abuse the power of legal documents and have the ability to impose the most severe and damaging consequences on businesses, even when no payments have been missed.

2.     Defendants prey upon businesses in need of financing, and plan elaborate schemes to fraudulently induce them into loans pursuant to so-called future account receivable

purchase agreements or merchant cash advance agreement ("MCA"), which are designed to evade the regulatory protections mandated by the laws of various states.

3.      Through conspiracy and the use of fraudulent practices, Defendants ensure that businesses like Plaintiffs would not be able to fulfill a responsible exit strategy after signing an MCA. Instead, Defendants earn the businesses' trust by offering fake generous partnership opportunities and discounts for loans paid off quickly, then pull the rug out at just the right time and use legal documents, along with fraudulent practices, to take money in excess of what is owed, paralyze the business, threaten its ability to operate, and ruin the business' reputation, in order to corner it into paying money even when default has not occurred.

4.      Defendants employ fraudulent, harassing, threatening, deceptive, and illegal collection tactics designed to bring businesses like Plaintiffs to financial ruin, while they recover amounts in excess of the amounts actually due and owed under the agreements.

5.      In this case alone, Defendants stole over $1.4 million dollars between December 19, 2018 and May 1, 2019 from Plaintiffs through fraudulent Automated Clearing House ("ACH") wire transactions.

6.      When Plaintiffs reached out the question the unauthorized withdrawal of funds, and explained the financial difficulties that Defendants' actions were causing – namely her inability to pay for rent, payroll and other company's expenses that were due two days later - Defendants did not provide an explanation, and instead offered to meet the following week.

7.      Taking advantage of Plaintiffs' financial distress that they had caused, Defendants offered an additional $100,000 loan to cover HMC's expenses until the date of their meeting.

8.      On the date of their meeting, when Plaintiffs once again questioned Defendants about the unauthorized amounts debited and requested return of the over $1.4 million that was

stolen, the owner of Defendant CBSG demanded that Plaintiff DiPietro sign a Repurchase Agreement for $11,940,053.45 and threatened to "blow up" her house if she did not comply.

9.      In addition to stealing over $1.4 million through interstate wires, Defendants also used interstate mail and e-mail to extort more than $11,985,719.32 from Defendants through financial duress and relentless personal harassment in direct violation of the Hobbs Act.

10.     On May 14, 2019, after Plaintiffs brought the more than $1.4 million theft to Defendants' attention and requested a refund of all monies wrongly taken via ACH debit, Defendants filed a fraudulent Confession of Judgment ("COJ") in the amount of $11,985,719.32, even though Plaintiffs were not in default under the contract documents. *See* Ex. 1.

11.     Plaintiffs were not notified of the filing until May 21, when DiPietro received notice in the mail.

12.     Between May 14 and May 21, 2019, Defendants continued debiting hundreds of thousands of dollars to Plaintiffs' bank account.

13.     In filing the COJ, Defendants grossly and fraudulently understated what Plaintiffs had already paid.

14.     Specifically, Defendants represented that the total amount of receipts purchased was $14,791,256.43, *see* Ex. 1, ¶ 6, and that the amount of unpaid receivables was $11,407,826.93, *see id.*, ¶ 17, meaning that HMC had only paid back a total of $3,383,430.

15.     In actuality, however, HMC had paid back more than $9 million. *See* Ex. 3.

16.     CBSG confessed judgment against Plaintiffs on the August 7, 2018 agreement, which had been fully repaid months earlier.  In doing so, CBSG also confessed judgment against Plaintiffs for attorneys' fees and interest on an agreement that was fully repaid.

17.     Defendants also unlawfully confessed judgment against Plaintiffs in the amount of $570,391.35 for the ministerial task of filing a confession of judgment, despite only being entitled to reasonable costs and fees for enforcing the terms of the agreements.  In support, Defendants falsely represented that the "$570,391.35 for attorney fees represents actual attorney fees incurred to date together with anticipated attorney fees associated with the enforcement of Defendants' payment obligations enumerated herein, among other matters." *Compare* Ex. 1, ¶ 15 *with id.,* Ex. A, Section 3.5 Costs.

18.     Defendants further unlawfully confessed judgment against Plaintiff DiPietro, personally, even though she never authorized Defendants to confess judgment against her personally. *See, e.g.*, *id.*, Ex. A, Section 3.4 Warrant of Attorney to Confess Judgment.

19.     Immediately upon entry of the unlawful judgment by the Philadelphia Court of Common Pleas, on May 14, 2019, Defendants strategically levied money from all but one of Plaintiffs' bank accounts, including bank accounts owned personally by Plaintiff DiPietro, without any advance notice of the judgment or the bank levies. *See* Ex. 4.

20.     Shortly thereafter, Defendants then engaged in their commonly used scheme dubbed as an "AR Smash" by sending out at least four thousands fraudulent e-mails to Plaintiffs previous clients, current clients, family members, neighbors, vendors, friends, and even some to recipients Plaintiffs do not know, falsely claiming that Plaintiffs had defaulted on their agreements with Defendants and instructing them comply with the letter's instruction and to send all payments due to Plaintiffs directly to Defendants.

21.     Even worse, Defendants sent over eleven-hundred harassing e-mails to Plaintiff Kara DiPietro's father and neighboring businesses with no association to Plaintiffs, in an unscrupulous attempt to intimidate and harass Plaintiffs. *See* Ex. 5.

22.     Plaintiffs regularly communicated with Defendant CBSG and Defendant was aware that there was no danger of them not getting paid.

23.     Plaintiffs never missed a payment and were not in "default" or breach of the agreement when Defendants filed the confession of judgment, levied their bank account, and sent out emails to Plaintiffs' clients falsely accusing them of being in default.

24.     After deploying these extortionate tactics, Defendant CBSG then attempted to extort $3.3 million from Plaintiffs through its in-house counsel, Dan Ring, who is presently suspended from the practice of law. *See* Exs. 6-7.

25.     Perhaps most disturbing, the $3.3 million demand by Defendant CBSG just so happens to be slightly less than the amount of Plaintiff DiPietro's keyman life insurance policy that named CBSG as the beneficiary. *See* Ex. 8.

26.     Unfortunately, the tactics employed in this case are part of a troubling pattern of unlawful conduct in violation of 18 U.S.C. § 1962, entitling Plaintiffs to treble damages and attorney's fees.

## THE PARTIES

27.     Plaintiff HMC is a corporation organized under the laws of Maryland with a principal place of business located at 7190 Oakland Mills Road # 10, Columbia, Maryland.

28.     Plaintiff Kara DiPietro is a resident and citizen of Maryland.

29.     Defendant Complete Business Solutions Group, Inc. d/b/a Par Funding ("CBSG") is a corporation organized and existing under the laws of Delaware, with a principal place of business located at 20 N. 3rd Street, Philadelphia, Pennsylvania, 19106.

5

30.     Defendant Fast Advance Funding, Inc. ("Fast Advance") is a corporation organized and existing under the laws of Delaware, with a principal place of business located at 20 N. 3rd Street, Philadelphia, Pennsylvania, 19106.

## JURISDICTION AND VENUE

31.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on HMC's claims for violations of the Racketeer Influenced and Corruption Organizations Act (RICO), 18 U.S. C. §§ 1961–68.  The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

32.     This Court has original jurisdiction based upon 28 U.S.C. § 1332(a) because no Plaintiff is a citizen of the same state as Defendants and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

34.     Venue is proper because each Defendant regularly conducts business within this judicial district.

35.     Each Defendant is subject to the personal jurisdiction of this Court because it resides within this Commonwealth.

36.     This Court also has jurisdiction under 28 U.S.C. § 2201 *et. seq.*

## FACTUAL BACKGROUND

**A.     HMC and Kara DiPietro.**

37.     HMC is a Maryland business offering a wide range of interior design, millwork, and construction services.

6

38.     HMC is owned and operated by Kara DiPietro.

39.     Kara DiPietro was the winner of Maryland's Small Business Week's "Small Business Person of the Year" in 2017.

40.     Between February 26, 2018 and October 3, 2019, HMC and CBSG entered into twenty-four separate merchant cash advance ("MCA") agreements, secured by a personal guarantee of its owner DiPietro.

41.     On the first nineteen MCA agreements entered into between February 26, 2018 and November 2, 2018, HMC received $12,332,444.85 from CBSG, and paid back $15,680,406.42.

42.     Thus, in a span of just ten months, CBSG earned a profit of $3,347,962.

43.     On the five MCA agreement entered into between August 24, 2018 and October 3, 2019, HMC received $10,531,297.25 from Defendants, and paid back $8,677,259.

44.     Each of the MCA agreements was structured as a "factoring" agreement on paper.

45.     In each MCA agreement, Defendants provided cash to HMC, and in exchange, HMC authorized Defendants to access and withdraw funds from HMC's bank account every business day via direct ACH transfer.

46.     Under the terms of the MCA agreement, the repayment amounts were supposed to be tied to specific receipts. *See, e.g.,* Ex. 1, Ex. A, pgs. 1-2.

47.     The daily amount paid by HMC was also supposed to approximate 10% of those receivables until CBSG received an agreed upon repayment amount.

48.     That, however, is not how CBSG acted under the MCA agreements. *See* Ex. 9.

49.     Instead, CBSG treated the MCA agreements like loans with fixed daily payments deducting fixed amounts on a daily basis untethered to the actual receipts or invoices generated.

7

50.     CBSG offered tailored discounts depending on the time in which the loans were paid back in full.  However, even after payment of the individual loan was complete, as confirmed by their accounting department, Defendants refused to provide a payoff letter and did not close the account, allowing for fees to continue accruing unbeknownst to the merchant, and charging them with fraudulent "finance fees."

51.     CBSG always agreed to "reconcile" accounts when asked, but never provided documents showing such reconciliation, rather was only willing to share the amount paid as of then, leaving Plaintiffs in the dark about where the payments were being allocated, or reasons for fees, if any were being applied.

52.     When questioned about discrepancies or the constant increase in the daily amount due in payment, CBSG never provided an actual explanation.

53.     Masked by the initial appearance of inconsistencies, CBSG's maneuvers became more frequent and blatantly illicit as the relationship with Plaintiffs went on, and as they earned the businesses' trust, hoping that they would comply with their requests and not question their actions, unlike Plaintiffs have done in this case.

**B.      The $1.4 Million Theft.**

### The December 19, 2018 Loan

54.     The loan agreement dated December 19, 2018 provides that CBSG will advance $3,890,000 in capital to HMC in exchange for daily payments equal to 10% of HMC's account receivables, until HMC paid CBSG back $5,446,000.

55.     CBSG initially began withdrawing daily amounts from HMC in the amount of $3,500 on December 19, 2018.

56.     CBSG then unilaterally increased the daily withdrawals from HMC's account without any basis.

57.     In December 2018, HMC's revenues were $370,080. *See* Ex. 3. Thus, 10% of HMC's monthly revenue in December was approximately $37,000. On a daily basis, CBSG was therefore entitled to take daily payments of $1,682 at most, which is $37,000 divided by 22 business days in a month.

58.     In January 2019, HMC's revenues declined even further to $313,898, which is 15% decrease in revenue. *See* Ex. 3.

59.     Despite this decrease in revenue, on January 23, 2019, CBSG began deducting $12,337 from HMC daily, an unexplained and unjustified 252% increase.

60.     Additionally, in February 2019, revenues continued to decline to just $140,123, a 55% drop in revenue. *See* Ex. 3.

61.     Once again, despite this drop in revenue, CBSG began deducting $14,525 per day on February 14, 2019, $16,713 per day on February 21, 2019, and finally $19,179.43 per day on February 26, 2019.

62.     Each of the increased daily withdrawals was done unilaterally by CBSG without notice or justification.

63.     By May 4, 2019, HMC was supposed to have repaid no more than $304,673 even if the entire month of December is included as revenues. HMC's total revenues from December 2018 through May 2019 was $3,046,733, 10% of which is $304,673.

64.     Instead, by May 4, 2019, CBSG unilaterally took $1,322,423.07 from HMC through ACH wire transfers, which is $1,017,750 more than it was entitled to under the agreement.

9

### February 27, 2019 Loan

65.    The loan agreement dated February 27, 2019 provides that CBSG would provide $3,350,000 in capital to HMC in exchange for daily payments of $4,583, which was supposed to approximate 10% of HMC's accounts receivables, until HMC paid CBSG back $4,690,000.

66.    Pursuant to the February 27, 2019 agreement, CBSG was authorized to directly debit HMC's bank account and withdraw the "Specified Daily Amount" of $4,583 every business day and would increase depending on revenues.

67.    In March 2019, HMC's revenues were $853,987.  Thus, 10% of HMC's monthly revenues was $85,398, which equates to a daily estimated payment of $3,882.

68.    Nevertheless, CBSG unilaterally increased the daily withdrawals from HMC's account. First, on March 14, 2019, CBSG began deducting $7,719 daily from HMC.  This amount was inexplicably increased to $9,995 on March 21, 2019, to $12,495 on March 28, 2019, to $14,995 on April 8, 2019, and finally to $19,995 per day on April 15, 2019.

69.    Of course, HMC's revenues were not going up to justify this incredible increase. They were going down.  In April 2019, HMC's revenues fell from $853,987 in March to $601,946 in April.

70.    By May 4, 2019, HMC was supposed to have repaid no more than $215,401 on the February 27, 2019 loan (47 business days x $4,583 per day).  Even less if the daily amounts were actually adjusted to reflect actual revenue.  HMC's total revenue for March and April was $1,455,933, 10% of which is $145,593.

71.    Instead, by May 4, 2019, CBSG took $596,765 from HMC, or more than $381,364 to which it was entitled to under the estimated daily payments, and nearly $450,000 more if the daily payments were adjusted to reflect actual revenue.

72.     Thus, CBSG withdrew over $1.4 million more than it was entitled to directly from HMC's bank account on just two loans.

**C.     CBSG Concedes Stealing From HMC**

73.     On May 1, 2019 DiPietro contacted Joseph LaForte to inquire about the unauthorized $1.4 million withdrawal of funds from the HMC account.

74.     After failing to receive an explanation, DiPietro also contacted Defendants' account manager who, on May 2, 2019, wrote that she did not know why the daily debits were increased, but would ask its owner.

75.     CBSG's account manager then wrote that its owner "said the agreements are fixed," admitting that the daily amounts debited should have been consistent, or "fixed."

76.     On May 3, while still attempting to understand what had happened, and still trying to get the funds that were illegitimately taken back, DiPietro contacted Defendants' again, laying out in details what the payments should have been, per the agreements,  and what Defendants' had taken instead.  She further explained the urgency of resolving the matter because, due to Defendants' unauthorized withdrawal of funds from HMC's account, the company was left without sufficient funds to pay for payroll, company expenses, and rent which were due on the same day.

77.     LaForte, once again did not provide an explanation, but instead only offered to meet in person on May 6, 2019, three days after Plaintiffs' expenses were due.

78.     LaForte, aware of the financial distress that they caused, offered DiPietro a $100,000 loan for her to make the necessary payments until their meeting date.

79.     Left with no other options, and hoping that the matter would be resolved and the money returned, Plaintiffs accepted to loan.

80.     What was supposed to be a $100,000 loan, on paper became a $285,178 advance agreement which included an additional $185,178 paying off an alleged existing balance. This agreement was never mentioned or listed as an open balance.

81.     On May 6, 2019 DiPietro traveled to Defendants' offices in Philadelphia to resolve the situation and retrieve the company's funds.

82.     When DiPietro, once again, questioned Defendants about the unauthorized amounts debited, and requested return of the over $1.4 million that was stolen, the owner of Defendant CBSG demanded that Plaintiff DiPietro sign a Repurchase Agreement for $11,940,053.45 and threatened to "blow up" her house if she did not comply.

83.     On May 6, 2019, after failing to respond to multiple requests by HMC to explain why the daily amounts debited increased so drastically, CBSG's "account manager" incredibly wrote, "TBH [to be honest], the ach payments are confirmed by Joe [LaForte] with each increase, I'm not sure how he calculated it."

84.     CBSG's account manager also provided HMC with an Excel spreadsheet showing how much CBSG took from HMC each day, without any explanation as to what the basis was for any increased withdrawals.

85.     HMC then retained counsel, who wrote to CBSG requesting an explanation. CBSG's counsel wrote on May 13, 2019: "I'm not sure of the payment details" and sent nothing more than a pdf summarizing how much CBSG was deducting per day from HMC, again without any explanation.

86.     Recognizing it was caught engaging in wire fraud, CBSG dropped the pretense of having any justification for stealing from HMC and attempted to settle, asking for $15,000 in payments per day.

12

87.     CBSG's attorney also bizarrely claimed that the daily amounts were increased "based on a percentage of income."

88.     As alleged above, the agreements called for HMC to pay approximately 10% of its accounts receivable to CBSG daily. As such, HMC's counsel asked what information CBSG used to determine HMC's income. CBSG's counsel circuitously responded, "[t]he dailies were based on the amount of income [HMC] received and we were able to access," again without explaining what information those calculations were based upon.

**D.     CBSG Concedes Adding $884,652.84 in Fraudulent Charges to HMC**

89.     CBSG's internal Excel spreadsheet e-mailed to HMC on May 6, 2019 also revealed an additional two fraudulent charges CBSG billed to HMC.

90.     First, on November 8, 2018, Par Funding charged HMC $472,356.60 in "finance fees" on an agreement dated August 28, 2018.

91.     Second, on December 12, 2018, CBSG charged another $412,296.24 in "finance fees" on an agreement dated October 3, 2018, totaling $884,652.84 in fraudulent "finance fees."

92.     Of course, like the transactions in the related *Fleetwood* case, if the transactions were true sales, there should not be "finance fees."

93.     HMC first saw these fraudulent charges on May 6, 2019.

94.     On May 13, 2019, HMC's counsel requested an explanation for the fraudulent "finance fees." CBSG's counsel responded, "I'm not sure of the payment details."

95.     The next day, CBSG's attorney wrote that the finance fees were charged since the two relevant agreements stated that "'[a]fter 44, Days, [the] principal [is] to be returned or we will reassess [the] factor rate.' Accordingly, there was to be a lump sum payment after 44 days. That did not occur, and [CBSG] assessed a new factor rate."

96.     CBSG's counsel was then asked where in the agreements anything like that was set forth, how that purported reassessment was undertaken, and how any new factor rate was determined.  CBSG has, to date, ignored that request for basic information concerning its claim.

97.     CBSG then had an employee named Gabriel Webster send a threatening email to DiPietro on May 20, 2019. "Gabriel Webster"[1] then called HMC's counsel, who informed Mr. Webster that HMC was still waiting for an explanation of the increased daily charges and the "finance fees." Mr. Webster said he could not explain them and would talk to CBSG's attorney.

98.     Later that day, CBSG's counsel still could not explain the finance fees, writing vaguely that "my understanding the finance fees were calculated based on the outstanding principal amounts at 44 days after the deal was funded because the principal was still unpaid.  I believe it amounted to about 9% of the total."

### E.     CBSG Starts Harassing HMC's Customers

99.     CBSG's attorney then wrote a letter "explaining" the "finance fees" by claiming that CBSG "increased" the "Factoring Rate" from "1.16 to 1.42" or "1.43." CBSG's attorney also claimed that HMC agreed to be fraudulently charged $884,652.84, which is why CBSG charged it. Again, CBSG provided no explanation about what basis it had for charging "finance fees" or increasing any "Factoring Rate."

100.     Doubling down on its fraud, on May 10, 2019, CBSG began sending emails containing notices of assignment to almost all of HMC's clients, claiming that CBSG was owed "$11,925,053.45," and that any amounts owing to HMC should instead be paid to CBSG. *See* Ex. 10.

---

[1] CBSG creates fake identities in order to threaten its borrowers.

14

101.   In an effort to make their fraud appear genuine, CBSG also attached UCC-1 filings over HMC's assets filed by CBSG to those emails. *See* Ex. 11.

102.   HMC is not aware of how many of those fraudulent notices CBSG sent by email, but it appears to be over **4,000**, with many of HMC's customers receiving multiple emails stating the same thing.

103.   CBSG even sent those fraudulent notices to neighbors of HMC and DiPietro, and DiPietro's father, who were never customers or clients of HMC.

104.   CBSG took these bad-faith actions solely in its effort to extort money from Plaintiffs by pressuring HMC's business and personally humiliating DiPietro.

## F.   CBSG's Threats and Intimidation Tactics

105.   On May 6, 2019, CBSG's owner told DiPietro that her home would be blown up if she did not sign a new contract and pay what she "owed."

106.   CBSG's owner also called HMC's lawyer and stated that while he wanted this dispute resolved, he did not want anybody to get "hurt."

107.   On May 10, CBSG's owner then texted DiPietro, "Get your fat ass up and call me," followed by "That was my last call. Now action." When DiPietro would not call, CBSG's owner wrote "Pick up coward." CBSG's owner called DiPietro on her cell phone no less than 19 times on May 9 and May 10, 2019. CBSG's owner even called DiPietro's father (who did not answer).

108.   Notwithstanding Defendants' threats and harassment practices, Plaintiffs were not cowed and refused to pay Defendants amounts clearly not owed.

109.   On May 14, 2019, Defendants then filed the fraudulent COJ.

15

110. On May 23, 2019, Defendants' attorney delivered a writ of execution to the Sheriff to freeze DiPietro's bank accounts.

**G.     The Fraudulent COJ Presents No Basis for the Judgment Amount.**

111. While the COJ requests judgment by confession for $11,985,719.32, it does not present any factual basis for that fictional number.

112. All the COJ asserts is that there are "Unpaid Receivables" in the amount of $11,407,826.93 without explanation, $7,501.04 in "interest," and $570,391.35 in "Attorney fees."

**H.     Continued Harassment of Plaintiffs.**

113. Defendants continue to contact HMC asking to speak to Plaintiff DiPietro with regards to "her account."

114. On June 26, 2019, just minutes after appearing before Congress with her undersigned attorney concerning **this very matter**, DiPietro received a telephone call from a woman who identified herself as "Maria" from Par Funding. She would later receive an email from "Jimmy," who was featured in the Bloomberg articles regarding the merchant cash advance industry. See, e.g., https://www.bloomberg.com/graphics/2018-confessions-of-judgment/.

115. Based on the above-harassing practices, Plaintiffs are forced to bring this action in order to protect both their business and individual well-being.

### FIRST CAUSE OF ACTION

#### Common Law, Mail and Wire Fraud (18 U.S.C. § 1343)

116. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

#### Common Law and Wire Fraud with Respect to the Agreements

16

117.    In connection with the December 19, 2018 and February 27, 2019 agreements, HMC authorized CBSG to initiate automated clearing house ("ACH") debits from its operating account with TD Bank in the amounts authorized under each agreement.   Ex. 1, Ex. C and D, therein.

118.    The ACH Authorization authorizes CBSG "to collect payments required under the terms of the Seller/Merchant Agreement by initiating ACH debit entries to the Designated Checking Account in the amount and on the dates provided in the payment schedule set forth in the accompanying Seller/Merchant Agreement.   Settler/Merchant authorizes Purchaser to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid fees." *Id.*

119.    Between January 23, 2019 and May 4, 2019, submitted ACH authorizations to TD Bank that CBSG knew falsely represented the amount it was entitled to take under the December 19, 2018 and February 27, 2019 agreements.

120.    CBSG made these knowingly false statements to TD Bank in an attempt to induce TD Bank to transfer money from HMC's operating account to CBSG.

121.    On information and belief, TD Bank reasonably relied upon these knowingly false representations by CBSG.

122.    As a direct and proximate result of these knowingly false representations by CBSG, at least $1,017,750 was stolen from HMC by CBSG in connection with the amounts due and owing on the December 19, 2018 agreement.

123.    As a direct and proximate result of these knowingly false representations by CBSG, at least $381,364 was stolen from HMC by CBSG in connection with the amounts due and owing on the February 27, 2019 agreement.

124.    As a direct and proximate result of these knowingly false representations by CBSG, HMC was unable to pay employees, insurance, vendors and other expenses necessary to operate the business, and was deprived of the use of desperately needed capital resulting in lost profits in excess of $1,000,000.

### Common Law Fraud with Respect to the Confession of Judgment

125.    On May 14, 2019, Defendants filed a confession of judgment with the Philadelphia Court of Common Please that knowingly misrepresented that HMC was in breach of the agreements with Defendants.

126.    At the time that Defendants made this representation, Defendants knew that Plaintiffs were not in breach of the agreements and had actually overpaid Defendants under the terms of the agreements.

127.    On May 14, 2019, Defendants filed a confession of judgment with the Philadelphia Court of Common Please that knowingly misrepresented the balance owed by Plaintiffs by falsely representing that HMC had an outstanding balance of $11,407,826.93.

128.    At the time that Defendants made this representation, knew that the actual outstanding balance owed by Plaintiffs was no more than approximately $3.4 million.

129.    On May 14, 2019, Defendants filed a COJ with the Philadelphia Court of Common Pleas that knowingly misrepresented the attorney's fees incurred and to be incurred in collecting upon the amounts due and owing under the agreements was $507,391.35.

18

130.    At the time that Defendants made this representation, Defendants knew this representation was false.

131.    On May 14, 2019, Defendants filed a confession of judgment with the Philadelphia Court of Common Pleas that knowingly misrepresented that Plaintiff DiPietro had authorized Defendants to confess judgment against her through a confession of judgment.

132.    At the time that Defendants made this representation, Defendants knew this representation was false.

133.    Defendants made the above knowing misrepresentations with the intent to induce the Prothonotary of the Court of Common Pleas to enter the judgment by confession.

134.    On information and belief, the Prothonotary reasonably relied upon these knowingly false representations in entering judgment against Plaintiffs.

135.    As a direct and proximate result of these knowingly false representations by Defendants, judgment was entered against Plaintiffs in the amount of $11,925,053.45.

136.    As a direct and proximate result of the judgment, Plaintiffs have been unable to obtain necessary financing and have defaulted on numerous government contracts resulting in damages in excess of $3,000,000.

### Common Law and Mail Fraud with Respect to Plaintiffs' Bank Accounts

137.    On May 17, 2019, Defendants caused to be served by Sheriff Writs of Execution on Wells Fargo, TD Bank, Capital One Bank, JP Morgan Chase & Co., Bank of America, M&T Bank, Santander Bank, PNC Bank, BB&T Bank, and HSBC Bank. *See* Ex. 4

138.    On May 17, 2019, Defendants served by U.S. Mail the fraudulent judgment above and the Writs of Execution on Plaintiffs. *See id.*

139.    At the time that Defendants caused the above Writs of Execution and Judgment, Defendants knew that both had been obtained by fraudulent means and that the representations contained therein were false.

140.    Defendants made the above knowing misrepresentations with the intent to induce the banks identified above to turn over $11,991,803.21 to Defendants.

141.    As a direct and proximate result of these knowingly false representations by Defendants, Plaintiffs' bank accounts held at Wells Fargo and Bank of America were frozen.

142.    As a direct and proximate result of these bank accounts being frozen, HMC was unable to pay employees, insurance, vendors and other expenses necessary to operate the business, and defaulted on numerous government contracts and sustained damages in excess of $3,000,000.

143.    As a direct and proximate result of these bank accounts being frozen, HMC was charged numerous fees by its banks, including a $350 bill of costs from Wells Fargo.

<u>**Common Law and Mail Fraud with Respect to the UCC Notices**</u>

144.    On May 10, 2019, Defendants began their common campaign dubbed an "AR Smash." It consists of sending out notices under the Uniform Commercial Code to various customers, vendors, personal relationships, and basically anyone that has ever come into contact with the business or individual owner. In doing so, Defendants attach a copy of a UCC filing, represent that the merchant is in default, and direct the recipient to pay Defendants directly. *See, e.g.*, 10.

145.    Between May 10, 2019 and July 2, 2019, Defendants sent at least 1,108 UCC notices to DiPietro's father. *See* Ex. 5.

146.    On July 2, 2019 alone, Defendants sent DiPietro's father 345 UCC notices, most of which were not even related to his company Dzurek Group LLC. *See id.*

147.    In sending these UCC notices, Defendants knowingly misrepresented that HMC was in breach of the agreements with Defendants, and that HMC had an outstanding balance of $11,925,053.45.

148.    At the time that Defendants made this representation, Defendants knew that Plaintiffs were not in breach of the agreements and had actually overpaid Defendants under the terms of the agreements.

149.    Defendants made the above knowing misrepresentations with the intent to induce the recipients to pay $11,925,053.45 directly to Defendants, and to harass, embarrass and extort money from Plaintiffs.

150.    On information and belief, some of the recipients of these UCC notices reasonably relied upon these knowingly false representations in withholding money due and owing to HMC.

151.    As a direct and proximate result of these knowingly false representations by Defendants, Plaintiffs have been unable to pay employees, insurance, vendors and other necessary expenses to operate the business.

152.    As a direct and proximate result of these knowingly false representations by Defendants, Plaintiffs have been deprived of desperately needed capital resulting in lost profits in excess of $1,000,000.

**Punitive Damages**

153.    All of the above conduct of Defendants was intentional, outrageous, and in reckless disregard of the Plaintiffs' rights for the purpose to extort money from Plaintiffs by putting pressure on them and threatening their reputation, both business and private.

## SECOND CAUSE OF ACTION

### Racketeer Influenced and Corrupt Organization Act (RICO)
### 18 U.S.C. § 1962(c)

154.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

### A.    Culpable Persons

155.    CBSG, Fast Advance and Joseph LaForte, Jr. are  "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

156.    At all relevant times, each of CBSG, Fast Advance and Joseph LaForte, Jr. was, and is, a person that exists separate and distinct from the Enterprise, described below.

157.    CBSG is a corporation capable of holding a legal interest in property and are thus "persons" within the meaning of 18 U.S.C. § 1962(c) as the term is defined by 18 U.S.C. § 1961(3).

158.    Fast Advance is a corporation capable of holding a legal interest in property and are thus "persons" within the meaning of 18 U.S.C. § 1962(c) as the term is defined by 18 U.S.C. § 1961(3).

159.    Joseph LaForte, Jr. has a controlling ownership interest in CBSG and Fast Advance, and manages and controls both companies through the d/b/a Par Funding.

160.    CBSG and Fast Advance solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in states that do not have usury laws.

### B.    The Enterprise

22

161.    CBSG, Fast Advance, and Joseph LaForte, Jr. constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

162.    CBSG, Fast Advance, and Joseph LaForte, Jr. are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and unlawfully collecting upon high interest loans through fraudulent and extortionate means.

163.    Since at least 2016 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and unlawfully collecting upon lawful and unlawful debt issued by the Enterprise to small businesses throughout the United States.

164.    Defendants, acting in concert, committed at least one predicate act of racketeering, as more specifically alleged below.  The acts of racketeering were not isolated; rather, they were related in that they had the same or similar purpose and result, participant, victims, or method of commission.  Further, the acts of racketeering have been continuous and spanning throughout the period from at least to 2016 to the present.

C.    **Each Member's Role in the Enterprise**

165.    The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

i.    **Joseph LaForte, Jr.**

166.    LaForte is the principal owner and operator of CBSG and Fast Advance.  LaForte is responsible for the day-to-day operations of the Enterprise and has final say on all business

23

decisions of the Enterprise including, without limitation, which loans the Enterprise will fund, how such loans will be funded, which investors will fund each loan and the ultimate payment terms, amount and period of each loan, including the loans extended to HMC.

167.    In his capacity as the day-to-day leader of the Enterprise, LaForte is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the loans including, without limitation, loans extended to HMC.

168.    LaForte has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, directing members of the Enterprise to collect upon the lawful and unlawful loans and executing legal documents in support of the Enterprise.

169.    In this case, LaForte personally solicited, underwrote, authorized and unlawfully collected upon the loans entered into between Plaintiffs, CBSG and Fast Advance.

170.    LaForte has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to CBSG, Fast Advance and to the investors of the deals in which he, upon information and belief, has personally participated.

ii.    **Defendant CBSG**

171.    CBSG is organized under the laws of Delaware and maintains officers, books, records, and bank accounts independent of Fast Advance and LaForte.

24

172.    Directly and through LaForte and its other agent employees, CBSG has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's unlawful collection of debt.  CBSG has been and continues to be responsible for: (i) entering into contracts with brokers to solicit borrowers for the Enterprise's loans and participation agreements with Investors to fund the loans; (ii) pooling the funds of investors in order to fund each usurious loan; (iii) underwriting the loans and determining the ultimate rate of interest to be charged under each loan; (iv) entering into the so-called merchant agreements on behalf of the Enterprise; (v) servicing the loans; (vi) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its name to further collect upon the unlawful debt.

173.    In this case, CBSG: (i) solicited borrowers, including HMC; (ii) pooled funds from investors to fund the agreements; (iii) underwrote the agreements; (iv) entered into the agreements; (v) collected upon the debt evidenced by the agreements by effecting daily ACH withdrawals from the bank accounts of HMC; and (vi) upon the alleged default by HMC, directed CBSG's attorney's to obtain a judgment in CBSG's name and to use unlawful and extortionate means to collect upon the debt.

174.    CBSG ultimately benefits from the Enterprise's unlawful activity by receiving a management fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds to Fast Advance, LaForte and the investors of the deals in which, upon information and belief, CBSG has directly participated.

### iii.    **Defendant Fast Advance**

175.    Fast Advance is organized under the laws of Delaware and maintains officers, books, records, and bank accounts independent of CBSG and LaForte.

176.    Directly and through LaForte and its other agent employees, Fast Advance has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's unlawful collection of debt.  CBSG has been and continues to be responsible for: (i) entering into contracts with brokers to solicit borrowers for the Enterprise's loans and participation agreements with Investors to fund the loans; (ii) pooling the funds of investors in order to fund each usurious loan; (iii) underwriting the loans and determining the ultimate rate of interest to be charged under each loan; (iv) entering into the so-called merchant agreements on behalf of the Enterprise; (v) servicing the loans; (vi) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its name to further collect upon the unlawful debt.

177.    In this case, Fast Advance: (i) solicited borrowers, including HMC; (ii) pooled funds from investors to fund the agreements; (iii) underwrote the agreements; (iv) entered into the agreements; (v) collected upon the debt evidenced by the agreements by effecting daily ACH withdrawals from the bank accounts of HMC; and (vi) upon the alleged default by HMC, directed Fast Advance's attorney's to obtain a judgment in CBSG's name and to use unlawful and extortionate means to collect upon the debt.

178.    Fast Advance ultimately benefits from the Enterprise's unlawful activity by receiving a management fee from the proceeds of the unlawfully collected debt from the

Enterprise's funneling of the loan proceeds to CBSG, LaForte and to the investors of the deals in which, upon information and belief, Fast Advance has directly participated.

**E.**      **Interstate Commerce**

179.     The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

180.     Specifically, members of the Enterprise maintain offices in Philadelphia, New York and Florida and use personnel in these offices to originate, underwrite, fund, service and unlawfully collect upon the loans made by the Enterprise to entities throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

181.     In the present case, all communications between the members of the Enterprise and Plaintiffs were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and unlawfully collect upon the agreements, fund the advances under each of the agreements and collect the Daily Payments via interstate electronic ACH debits.

182.     In addition, at the direction of LaForte, CBSG and Fast Advance, each of the agreements was executed in states outside of Pennsylvania, and original copies of the agreements were sent from Maryland to CBSG and Fast Advance at their office in Pennsylvania via electronic mail.

**F.**      **The Predicate Acts**

183.     The Enterprise has committed numerous predicate acts defined under 18 U.S.C. § 1961(1), which include the unlawful collection of debt in violation of 18 U.S.C. § 1343 (wire fraud) and extortion in violation of 18 U.S.C. § 1951 (the Hobbs Act).

184.     Specifically, between January 23, 2019 and May 4, 2019, the Enterprise committed no less than fifty predicate acts of wire fraud in violation of 18 U.S.C. § 1343 by fraudulently initiating ACH wire debits from HMC's TD Bank account in amounts totaling over $1.4 million more than it was authorized to debit.

185.     On May 17, 2019, the Enterprise also engaged in mail fraud in violation of 18 U.S.C. § 1343 by serving a fraudulent judgment and Writ of Execution on Plaintiffs through the U.S. Mail.

186.     On May 20, 2019, May 21, 2019, May 22, 2019, June 12, 2019, June 21, 2019, and July 2, 2019, the Enterprise committed no less than 1,108 predicate acts of wire/mail fraud in violation of 18 U.S.C. § 1343 by sending out fraudulent UCC notices through electronic mail.

187.     In addition, between May 10, 2019 and the present, the Enterprise has engaged in extortion in violation of 18 U.S.C. § 1951 by sending no less than 1,108 fraudulent UCC notices to various customers, vendors and family members in an attempt to embarrass, humiliate, and financially extort money from Plaintiffs.

### G.     Injury and Causation

188.     Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

189.     The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, the over $1.4 million in improperly collected loan payments and the unlawful entry and enforcement of judgments.

190.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

191.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

### THIRD CAUSE OF ACTION

### (Conspiracy under 18 U.S.C. § 1962(d))

192.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

193.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

194.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and unlawful collection of the loans, including the agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.   Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to unlawfully collect upon debts in violation of 18 U.S.C. § 1962(c).

195.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).   In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and

execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the agreements at issue herein.

196.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

197.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

198.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments and the unlawful entry and enforcement of judgments.

199.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

200.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.  The Court should also enter such equitable relief as it deems just and proper to preclude the Defendants from continuing to solicit, fund and collect upon unlawful debt, including the Agreements.

## FOURTH CAUSE OF ACTION

### Breach of Contract

201.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

202.    Under the terms of the agreements entered into between HMC and CBSG on December 19, 2018 and February 27, 2019, HMC was to repay the Purchased Amount under

each agreement through daily payments equivalent to 10% of the receivables actually delivered to HMC. *See* copies of agreements in Ex. 1, Ex. C and D therein.

203.    From the inception of the December 19, 2018 agreement until the time that CBSG unlawfully confessed judgment against Plaintiffs, 10% of the actual receivables delivered to HMC was no more than $304,673.

204.    The amount actually debited by CBSG was $1,322,423.

205.    Accordingly, under the December 19, 2018 agreement, CBSG owes HMC at least $1,017,750.

206.    From the inception of the February 27, 2019 agreement until the time that CBSG unlawfully confessed judgment against Plaintiffs, 10% of the actual receivables delivered to HMC was $145,593.

207.    The amount actually debited by CBSG was $596,765.

208.    Accordingly, under the February 27, 2019 agreement, CBSG owes HMC at least $451,172.

209.    In total, CBSG owes HMC at least $1,468,922.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, and seek an order from the Court:

a)    Enjoining Defendants from their unlawful conduct;

b)    Awarding Plaintiffs direct and consequential damages in excess of $3,000,000;

c)    Awarding Plaintiffs treble and punitive damages;

d)    Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

e)    Granting such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues properly so tried.

Dated:  September 13, 2019

WHITE AND WILLIAMS LLP

By:_____

Shane R. Heskin
WHITE & WILLIAMS, LLP
1650 Market Street, Suite 1800
Philadelphia, PA 19103
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I Shane R. Heskin, hereby certify that on September 13, 2019, the foregoing Plaintiff's First Amended Complaint was filed electronically.  Notice of this filing will be sent to all parties by operation of the court's electronic filing system.

BY: _____

Shane R. Heskin, Esq.

33